

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 21, 2019

**BY ECF**

The Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
New York, New York 10007

    Re:    *United States v. Vito Gallicchio*, **17 Cr. 390 (ALC)**

Dear Judge Carter:

    The Government respectfully submits this letter brief in reply to the defense's October 16, 2019, post-*Fatico* submission (Doc. 204). For the reasons set forth below as well as in the Government's October 1, 2019 submission (Doc. No. 198), the Government submits that the applicable Guidelines range is 240 months' imprisonment, because (1) the base offense level is 36 based on the defendant's agreement to distribute more than 5,603 grams of oxycodone (or more than 30,000 kilograms of marijuana equivalent), (2) the defendant is entitled to a four-level adjustment pursuant to § 3B1.1 because he was an organizer or leader in the narcotics conspiracy, and (3) the defendant should receive a two-level adjustment for obstruction of justice because he tampered with witnesses within the meaning of § 3C1.1.  Finally, the defendant should be ordered to forfeit $2,738,550, the amount of the defendant's gross proceeds from his sale of oxycodone.

    **I.  Drug Quantity**

    As explained in the Government's opening submission, the defendant is responsible for diverting **186,795** 30-milligram oxycodone pills (or 5,603 grams) between January 2012 and June 2017, consisting of:  (1) **82,120** medically unnecessary pills 30-milligram oxycodone pills that David Taylor prescribed to the defendant and nine other "patients" that the defendant referred to Taylor, and (2) **104,675** oxycodone 30-milligram pills that Avicolli sold to the defendant.  *See* Gov't Oct. 1 Sub. at 2-4.  For purposes of calculating the drug quantity under the Guidelines, the defendant does not dispute the first of these two components.  *See* Def. Oct. 16 Sub. at 2 ("[T]here is no real dispute about the 82,120 pills obtained through prescriptions written by Dr. Taylor."). However, the defendant denies buying the more than 100,000 pills from Avicolli and instead suggests that there were "many other more likely recipients" of the pills than the defendant.  Def. Oct. 16 Sub. at 2.  The defense's wild speculation should be rejected for several reasons.

*First*, Avicolli's trial testimony and the DEA's desk audit establish by a preponderance of the evidence that the defendant bought from Avicolli 104,675 oxycodone 30-milligram pills. Avicolli testified at trial that he diverted the approximately 100,000 pills to the defendant. (Trial Tr. at 343). A DEA audit—which the defendant does not challenge in any way—confirmed that the discrepancy between the oxycodone 30-milligram pills ordered by Avicolli from wholesalers and those he lawfully dispensed from June 2012 through June 2017 was slightly higher: 104,675 oxycodone 30-milligram pills. (Hrg. Tr. 67-68.) This discrepancy was entirely attributable to Avicolli's relationship with the defendant, and Avicolli never admitted to selling oxycodone without a prescription to anyone other than the defendant. (Trial Tr. 343, Hrg. Tr. 77.)

The defendant's speculation that Avicolli might have diverted the pills to loan sharks rather than the defendant is baseless. Def. Oct. 16 Sub. at 2-7. There is no dispute that, as Avicolli candidly testified, he owed a significant amount of money to loan sharks. (Trial Tr. at 305). In fact, that is precisely why, after initially refusing the defendant's overtures, Avicolli eventually agreed to sell the defendant oxycodone pills without a prescription. (Trial Tr. at 303-305). Avicolli then used the money the defendant gave him to pay his loan sharks. Confronted with these straightforward facts, the defense concocts an imaginary world in which it was somehow "more likely" that Avicolli paid his creditors in pills rather than the cash he earned from selling the pills to the defendant, and then lied about it under oath at trial. This fantasy should be rejected out of hand.

*Second*, the defendant has no meaningful response to the devastating videos from the defendant's phone of the defendant with stacks of $100 bills saying that the money was for "big Nick" (i.e., Avicolli). (*See* Hrg. Tr. 070). The defendant seems to take comfort in the fact that the videos prove that Avicolli "desperately needed to maximize what he was making" because "he needed those huge amounts in order to satisfy the loan sharks." Def. Oct. 16 Sub. at 4. Of course Avicolli was desperate and of course Avicolli needed money to pay off the loan sharks. That's why he needed the vast amounts of cash that the defendant was handling in the video and why he sold the defendant more than 100,000 oxycodone pills. Stunningly, the defendant offers no explanation whatsoever as to why he was handling so much cash that he clearly says in the video was for "big Nick" (i.e., Avicolli). The answer is simple: the defendant used the cash in the videos to pay Avicolli for massive amounts of oxycodone pills.

The Court should find that the base offense level is 36 based on the defendant's agreement to distribute more than 5,603 grams of oxycodone.

### II. Obstruction of Justice

An obstruction of justice enhancement, pursuant to Section 3C1.1, is appropriate in this case because the defendant attempted to tamper with no less than four witnesses prior to the *Fatico* hearing—Nicholas Avicolli, Michael Farley, Tara Farley and Elizabeth Grieco—and then, during the *Fatico* hearing itself, audibly scoffed and gestured to Mr. Farley during his testimony in an attempt to intimidate him. *See* Gov't Oct. 1 Sub. at 4-5. The defense submission does nothing to undermine the overwhelming evidence on this point.

*First*, the defense submission offers no explanation or apology for the defendant's despicable behavior during the *Fatico* hearing when the defendant "interfered," as the Court found, with the proceedings with his exaggerated and disruptive reactions to Mr. Farley's testimony. (Hrg. Tr. 25). Such blatant attempts by the defendant to "threaten[], intimidate[e], or otherwise unlawfully influenc[e]" a witness is heartland obstruction of justice. U.S.S.G. § 3C1.1, Application Note 4(A). The undisputed facts as to the defendant's behavior during the *Fatico* hearing are themselves sufficient for the Court to apply an obstruction of justice enhancement, pursuant to Section 3C1.1.

*Second*, the defense submission does not dispute the defendant's attempt to tamper with Nicholas Avicolli. As described in the Government's October 1 submission, Avicolli reported to the Government that the defendant attempted to get into contact with him several times following his arrest in this case. Avicolli reported to the DEA that he believed Gallicchio "spoof[ed]" his phone number and called Avicolli to harass him. (Hrg. Tr. 78-79). The defendant does not dispute this, which is also by itself sufficient for the Court to apply an obstruction of justice enhancement

*Third*, the defense tries, but fails, to paint Tara Farley's grand jury testimony as evidence that he did not threaten Tara and Michael Farley, but it is no such thing. As initial matter, the defense makes its argument while "assuming Mr. Gallicchio was the caller." Def. Oct. 16 Sub. at 2. But the defense cannot seriously dispute that the defendant was the caller. Phone records, which the defense does not challenge in any way, confirmed that the defendant called Ms. Farley on the day in question. (Hrg. Tr. 79-80; 81-82). Furthermore, in conversation with Det. Del Rosario, Ms. Farley was "[v]ery specific that [the caller] was Vito," Hrg. Tr. 81, and she testified as to her belief that the defendant was the caller in the grand jury. (Farley 3526-01 at 3). There can be no doubt that the defendant, regardless of the precise words that were used, threatened the Farleys. Ms. Farley testified that the defendant told her that "Mike is a rat," a message she understood she was supposed to convey to Mr. Farley. She further testified that she was afraid of Gallicchio, because he was "dangerous," "behaved erratically" and that Gallicchio knew where she lived and where her kids went to school.

*Finally*, the defense tries to distort the recorded conversation between the defendant's brother, Wayne Agnello, and Peter Mello, but he ignores the most critical portion of the call. At one point, Agnello says:

> So get me like, so you need like ten grand for my brother, so your girl does the right thing and doesn't go testifying against my brother, so we'll take care of that, and then don't have to worry about shit. 'Cause that's what my brother wants. He doesn't want to be worrying about shit.

GX 207T. The defense has no explanation for this portion of the call, which is the most pertinent and the most devastating. It is crystal clear from this excerpt that the idea originated with the defendant ("Cause that's what my brother wants") and that the defendant's intention was to prevent Grieco's testimony ("so your girl does the right thing and doesn't go testifying against my brother"). None of the defendant's rhetorical gymnastics undermine, or even address, the clear

and inescapable conclusion to be drawn from Agnello's and the defendant's attempt to the tamper with Grieco's potential testimony.

Any of the four instances of obstruction of justice described above and in the Government's October 1, 2019 submission, including the defendant's undisputed obstructive behavior at the *Fatico* and the defendant's undisputed attempts to intimidate and harass Avicolli, are sufficient for the Court to impose an obstruction enhancement. The Government has satisfied its burden with respect to this enhancement four times over.

### III. Leadership Role Adjustment

The Court should reject the defendant's claim that a three-point "manager or supervisor" enhancement is appropriate, rather than a four-point "organizer or leader" enhancement for several reasons.

*First*, the Guidelines make clear that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, Application Note 4. Thus, contrary to the defendant's suggestion, Def. Oct. 21 Sub. at 12-13, the fact that the defendant's narcotics conspiracy may have had multiple leaders is no obstacle to the defendant's receipt of four leadership points.

*Second*, the facts (which are not in dispute) clearly establish that the defendant was an organizer or leader when considered light of the factors set forth in Application Note 4 to U.S.S.G. § 3B1.1. With respect to the "recruitment of accomplices," the defendant was personally responsible for recruiting (1) Lawrence Montalbano, (2) Michael Farley, (3) Tara Farley, (4) Leonard Danzi, (5) Don Michael Carim, (6) Brian Dolinko, and (7) John Marino to become patients of Taylor, to obtain oxycodone from Taylor and to sell Gallicchio some or all of the oxycodone the so-called "patients" were able to obtain. (Trial Tr. 54, 137, 331-32, Hrg. Tr. 144-149.) Gallicchio likewise purchased oxycodone from other Taylor patients, including Elizabeth Grieco. (*Id.*) Gallicchio was therefore responsible for planning and overseeing criminal activity with five or more participants, rendering him a leader or organizer within the meaning of the Guidelines. Furthermore, there is no doubt that the defendant claimed a "right to a larger share of the fruits of the crime." Application Note 4 to U.S.S.G. § 3B1.1. Once Gallicchio collected the oxycodone from the members of his crew, he distributed that oxycodone among several mid-level suppliers, including Daniel Garcia, Michael Barberi, and Frank Volpe. (Hrg. Tr. 19-23).

The criminal conspiracy was extensive and Gallicchio was the leader of it, entitling him to a four-level adjustment under § 3B1.1.

### IV. Forfeiture

In its submission, the defense continues to insist that the defendant had a serious oxycodone addiction and that his forfeiture obligation should be reduced accordingly. The defense's outrageous claim should be rejected. As set forth in the Government's October 1 submission, the defendant must forfeit $2,738.550 as the proceeds of his oxycodone sales.

As stated in the Government's October 1 submission, the defendant obtained 77,895 oxycodone 30-milligram pills from David Taylor himself and through the members of crew. *See* Gov't Oct. 1 Sub. at 8. This figure accounts for the fact that some of the members of the defendant's crew did not provide the defendant with all of the pills that they obtained from David Taylor. The defendant does not dispute this calculation. The defendant first made the claim that, with respect to the pills he and the members of his crew obtained from David Taylor, he "took *most* of them and sold some of them to other people." Gallicchio Plea Tr. at 19 (emphasis added). Now, he claims, in essence, that he sold only half of these pills, and consumed the rest. Def. Oct. 16 Sub. at 6-7. This is astounding. In other words, the defendant seems to be suggesting that he took half of the 77,895 oxycodone 30 milligram pills that he and his crew members obtained over the five-year period of the conspiracy from David Taylor. That's 7,789 pills a year, or more than 21 pills per day. This is incredible on its face and contradicted by the other evidence.

Tellingly, the defendant offers no rebuttal to (1) Farley's testimony that he never saw the defendant take oxycodone, Hrg. Tr. 16, (2) Farley's testimony that he never saw the defendant appear high or discussed with the defendant his need for drug treatment, Hrg. Tr. 17, (3) Farley's testimony about the defendant crushing up an oxycodone pill and pouring the crushed up pill into his urine – a clear sign there was no oxycodone in his system, Hrg. Tr. 15-16, (4) Farley's testimony about the defendant taking a "quarter" pill at a time, which Gallicchio explained was to ensure the oxycodone was in his system in the event Taylor requested a urine sample, Hrg. Tr. 16-17, or (5) the fact that the only urine test in Gallicchio's patient file from Taylor's office showed that, in June 2012, Gallicchio's urine was negative for noroxycodone (the oxycodone metabolite) meaning Gallicchio had not ingested any oxycodone prior to the test. (Trial Tr. 516-517.) All this evidence clearly establishes that the defendant sold the pills he obtained from others, and did not use them.

Finally, the defendant states that the forfeiture awards should be limited to the "actual net proceeds," or profits, that the defendant received for the pills he sold. Def. Oct. 16 Sub. at 7. This is baseless and contrary to well-established law. *See, e.g., United States v. Kahn*, 761 Fed. App'x 43, 47 (2d Cir. Feb. 1, 2019) ("[T]he forfeiture statute for drug crimes is not limited to *profits* from those crimes; rather, it extends to "any property constituting, or derived from, any *proceeds* the person obtained, directly or indirectly, as the result of" the crime of conviction. 21 U.S.C. § 853(a)(1) (emphasis added)"). Gallicchio sold oxycodone to Daniel Garcia and Michael Barberi for approximately $15 per pill. (Hrg. Tr. 19-21.) On occasion, Gallicchio was able to sell them for up to $20 per pill. (Hrg. Tr. 74.) Conservatively estimating based on these figures, if Gallicchio received $15 per pill for the 182,570 oxycodone pills he received, Gallicchio grossed $2,738,550 over the course of the conspiracy. Gallicchio should be ordered to forfeit this amount as the proceeds of his crime.

## V. Conclusion

Accordingly, based on the evidence set forth at trial and the *Fatico* hearing, the Government submits that the Guidelines range is 240 months' imprisonment, and a Guidelines sentencing is appropriate in this case. In addition, the defendant should be required to forfeit $2,738,550.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney for the
                Southern District of New York

            By: /s/_____
                Kiersten A. Fletcher
                Nicolas Roos
                Justin V. Rodriguez
                Assistant United States Attorneys
                (212) 637-2238

cc:    Counsel of Record (by ECF)